UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Ginger Ruth Bedell,

        Plaintiff,

    v.                            Civil Action No. 1:12-cv-126

Commissioner of Social Security,

        Defendant.


## REPORT AND RECOMMENDATION
(Docs. 25, 29)

     Plaintiff Ginger Bedell brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying her application for disability insurance

benefits.  Pending before the Court are Bedell's motion to reverse the Commissioner's

decision (Doc. 25), and the Commissioner's motion to affirm the same (Doc. 29).  For the

reasons stated below, I recommend that Bedell's motion be GRANTED, the

Commissioner's motion be DENIED, and the matter be REMANDED for further

proceedings and a new decision.

## Background

     Bedell was 37 years old on her alleged disability onset date of

August 1, 2008.  She completed high school, and has experience working as a fast-food

worker, a housecleaner, and a sales clerk.  She lives with her husband and has two

children.

As a child, Bedell and her siblings were physically abused by their father.  (AR 286, 369, 484.)  Bedell was a loner in school and did not socialize outside of school.  (AR 484.)  Her mother died when she was fifteen, and her father died when she was in her late twenties.  (AR 369.)  In November 2007, Bedell's children, who were approximately three and seven years old at the time, were taken into state custody as a result of her and her husband's insufficient parenting.  (AR 481, 484, 513.)  As of February 2010, Bedell had scheduled appointments to see her children approximately once each week (AR 261, 264), but by August 2011, she was seeing them much less frequently (AR 51).

Bedell is morbidly obese and diabetic, and has failed to take her medications, including insulin, on a regular basis.  She also has depression, and has neglected to take her medications for this as well.  She does not regularly spend time with others, socializing only with her husband, who does not work and receives disability benefits.  (AR 261–62, 371.)  On good days during the alleged disability period, Bedell would watch television, nap, read, knit, crochet, do light household chores for short periods of time, and play cards.  (AR 50, 237, 257, 259, 261.)  On bad days—which she stated she had more frequently than good—she would not want to get out of bed and would do very little, including perhaps reading, knitting, or watching movies.  (AR 238, 246.)

In March 2009, Bedell filed applications for social security income and disability insurance benefits.  In her disability application, she alleged that she is unable to work because of her depression, neuropathy in her feet, carpal tunnel syndrome, and diabetes.  (AR 246.)  In a disability form, Bedell stated that her depression "is the biggest barrier for [her] to be employed."  (*Id*.)  She further stated that she has no motivation to do

anything, and she "just want[s] to stay in bed" some days.  (*Id.*)  Bedell told a consulting

psychologist that she stopped working after calling in sick "a lot" because she was too

depressed to get out of bed.  (AR 369.)  Similarly, at the administrative hearing, she

testified that she is unable to work because she is unreliable, self-isolating, and has a hard

time getting out of bed.  (AR 53.)  She further testified that she has not properly managed

her diabetes because "a lot of times" she becomes so depressed that she does not care

whether she is "here" or not.  (AR 60.)  She stated that she was not getting mental health

treatment at the time of the administrative hearing because she "ha[s] a hard time making

the appointment[s]."  (AR 54.)

Bedell's application was denied initially and upon reconsideration, and she timely

requested an administrative hearing.  The hearing was conducted on August 4, 2011 by

Administrative Law Judge ("ALJ") Debra Boudreau.  (AR 41–74.)  Bedell appeared and

testified, and was represented by an attorney.  In addition, a vocational expert appeared

and testified at the hearing.  On August 12, 2011, the ALJ issued a decision finding that

Bedell was not disabled under the Social Security Act from her alleged onset date

through the date of the decision.  (AR 22–34.)  Thereafter, the Appeals Council denied

Bedell's request for review, rendering the ALJ's decision the final decision of the

Commissioner.  (AR 1–3, 12–14.)  Having exhausted her administrative remedies, Bedell

filed the Complaint in this action on June 8, 2012.  (Doc. 1.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Boudreau first determined that Bedell had not engaged in substantial gainful activity since her alleged onset date of August 1, 2008. (AR 24.)  At step two, the ALJ found that Bedell had the following severe impairments: "diabetes mellitus, major depressive disorder single episode, anxiety disorder [not otherwise specified] vs. [rule out posttraumatic stress disorder], [rule out] borderline personal[ity] disorder, and obesity."  (*Id.*)  The ALJ noted that Bedell has "poor control" of her diabetes and "some neuropathy causing pain in her feet."  (*Id.*)  She further noted that Bedell's diabetes is "complicated by her depression."  (AR 25.)  Conversely, the ALJ found that Bedell's "status post bilateral carpal tunnel release" and "the early beginnings of diabetic retinopathy in the left eye" were non-severe impairments.  (*Id.*)  At step three, the ALJ found that none of Bedell's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 25–27.)

Next, the ALJ determined that Bedell had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), with the following limitations:

> [S]he can stand and walk with normal breaks for a total of 4 hours in an 8-hour workday.  She has no limitations on sitting.  [Bedell] should never climb ladders, ropes, or scaffolds.  She can occasionally climb ramps and stairs; she can occasionally crawl.  She can frequently balance, stoop, kneel[,] and crouch.  She has no limit on exposure to extreme heat, but should avoid concentrated exposure to extreme cold.  She has no limit on exposure to humidity, but should avoid concentrated exposure to wetness.  She has no limit on exposure to noise, but should avoid even moderate exposure to vibration.  She has no limitation on exposure to pulmonary irritants, but should avoid concentrated exposure to hazardous machinery and unprotected heights.  [Bedell] retains the understanding for 1-3[-]step

5

> instructions and is able to sustain concentration, persistence, and pace for 2-hour periods over an 8-hour workday and 40-hour workweek, but she may have some decrease in concentration, persistence, and pace, which could temporarily undermine her cognitive efficiency.  This decrease in concentration, persistence, and pace would not exceed what is customarily acceptable in the unskilled job setting.  She has no restriction on social interactions, but could have some difficulty accepting supervisory criticism; however, unless the criticism is beyond that typically acceptable in the workplace, such would not interfere with task accomplishment.  She is able to set goals and handle change, but may need some additional supervisory support of not more than 30 days with significant shift in task expectations.

(AR 27.)  Given this RFC, the ALJ found that Bedell was unable to perform her past relevant work as a sales clerk and a hospital cleaner.  (AR 32.)  Based on testimony from the vocational expert, however, the ALJ determined that Bedell could perform other jobs existing in significant numbers in the national economy, including the jobs of cashier, call operator, marker, telemarketer, sorter, and document preparer.  (AR 32–33.)  The ALJ concluded that Bedell had not been under a disability from the alleged onset date of August 1, 2008 through the date of the decision.  (AR 33.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the

administrative record *de novo* to determine whether there is substantial evidence

supporting the . . . decision and whether the Commissioner applied the correct legal

standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.

Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more

than a mere scintilla; it means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the

Social Security Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

I recommend remanding for further proceedings and a new decision.  The ALJ's

decision that Bedell is not disabled is founded on her assignment of great weight to the

non-examining agency consultant opinions and limited weight to the opinions of Bedell's

treating nurse, service coordinator, and social worker.  Although the ALJ was entitled to

give more weight to the consultant opinions than to the treating provider and other source opinions, she did not provide good reasons in support of her decision, as discussed below.

## I.      Relevant Medical Evidence and Opinions

Before evaluating the ALJ's analysis of the medical opinions, I summarize those opinions here, primarily to demonstrate (1) the consistency among the opinions of those who had a treating or other relationship with Bedell, and (2) the drastic difference between these opinions and those of the non-examining agency consultants.

### A.      Nurse Practitioner Dorothy Malone-Rising

Nurse Practitioner ("NP") Dorothy Malone-Rising and her practice group, Johnson Health Clinic and Diabetes Center of Lamoille County, treated Bedell's diabetes and other medical problems starting in October 2002.  (AR 367, 705.)  In an April 2009 letter to Vermont Disability Determination Services, NP Malone-Rising listed Bedell's medical problems as type-2 diabetes, hypertension, obesity, depression, and complications of diabetes including retinopathy and peripheral neuropathy.  (AR 367.)  She stated that Bedell's diabetes "could be well managed if [Bedell] attended to the mechanics of treating [it] appropriately," and that Bedell was "most debilitated by her depression[,] . . . which causes her to have little motivation to do the work necessary to maintain her health," including regularly filling her insulin pump.  (*Id.*)  Stating that she is "not a trained disability evaluator," NP Malone-Rising recommended that Bedell be evaluated by a psychologist and a physician trained in doing disability evaluations.  (*Id.*)

A little over two years later, in July 2011, NP Malone-Rising stated in a letter that Bedell "is profoundly depressed to such a degree that she regularly misses required

medications," and "[s]he has been so paralyzed by her depression that she will run out of her insulin and go for days before refilling the pump."  (AR 705.)  Despite stating in her initial letter that she was not qualified to evaluate whether Bedell was disabled, NP Malone-Rising opined that Bedell "is severely disabled by her depression[,] . . . which affects every aspect of her life."  (*Id.*)

Although the ALJ afforded "great weight" to NP Malone-Rising's April 2009 opinion that Bedell's diabetes and complications of diabetes were not debilitating (AR 29), she afforded a lesser amount of weight to NP Malone-Rising's July 2011 opinions about the severity and effects of Bedell's depression (AR 31).  The ALJ explained that the latter opinion about Bedell's depression "did not [include] a detailed functional assessment."  (AR 32.)  The ALJ also noted that NP Malone-Rising "deferred to the evaluation of psychologists or physicians trained in disability evaluations."  (AR 31.)

## B.    Service Coordinator Allison Joyal Silveria

In June 2009, Bedell began seeing Allison Joyal Silveria, a service coordinator for Central Vermont Community Action[1].  In February 2010, after Silveria and her colleagues had met with Bedell and her husband multiple times, Silveria stated in a letter to Disability Determination Services that Bedell displayed a limited ability to understand, remember, and follow instructions; only sporadically attended appointments and

---

[1]  Although Silveria is not a psychologist or a social worker, she was a nurse for over ten years and a mental health crisis worker and case manager for over five years.  (AR 631.)  It appears from a review of the record that the job of "service coordinator" at Central Vermont Community Action involves assisting clients like Bedell in obtaining government benefits and services, and ensuring clients maintain housing and pay their essential bills including gas and electricity.  (*See, e.g.*, AR 632–57.)

completed required forms; was unable to maintain "socially appropriate" behavior; and exhibited poor hygiene.  (AR 630.)  Silveria further stated:

> [Bedell] tends to ignore [stressful situations] and hope [they] will go away. She has thrown away several months . . . of bills, ignored her phone, mortgage, electric, sewer, fuel and water bills–until everything was shut off and the family was in severe crisis.  During these times of stress, [Bedell] will sleep 20 or more hours a day (self[-]reported).  She tends to appear to be in another world; not really engaging with people and things around her. If not sleeping, she is generally reading.  [Bedell] seems unable to make herself do [the necessary requirements of living including applying for fuel assistance or taking steps to maintain housing], *even with offers of help*. Often, she waits until things have reached a crisis level.  According to my coworkers, this is a long pattern.

(AR 630–31 (internal quotation marks omitted) (emphasis in original).)  Silveria concluded by stating: "[Bedell's] depression seems paralyzing."  (AR 631.)

The ALJ gave Silveria's opinions "only limited weight" because (1) Silveria is not an "acceptable medical source" under the regulations; and (2) her opinions are "not fully supported by or consistent with the record."  (AR 31.)  The ALJ also noted that Silveria's comments about Bedell's poor hygiene are "not reflected elsewhere in the record."  (AR 30.)

### C.    Social Worker Kerrie Johnson

In April 2010, Kerrie Johnson, a social worker for the Vermont Department for Children and Families, submitted a letter summarizing her observations and opinions of Bedell.  (AR 662.)  Johnson interacted with Bedell during team meetings and supervised visits with Bedell's children, who were in state custody, and in Bedell's home "on a number of occasions."  (*Id.*)  In relevant part, Johnson stated:

>Based upon my observations, [Bedell] appears to suffer from very severe depression. . . .  During the numerous home visits I conducted at different times of day, I observed that [Bedell] was frequently sleeping.  I estimate that [Bedell] sleeps at least 18 hours per day.  [Bedell] has a great deal of trouble getting to appointments and misses a third of her visits with her children because she is unable to get herself out of the house.  During the visits she does attend, she is often unable to interact with her children . . . despite direction and prompting from the visit supervisor.  [Bedell] also frequently misses important court hearings and team meetings due to her depression.  [She] has an extremely hard time dealing with stress and will tend to "shut down" rather than mak[e] her feelings or needs known to others.  [Bedell] also struggles with self-care and tends to present with unkempt hair, unwashed/wrinkled clothing[,] and a slight, but noticeable body odor.

(*Id.*)  Finally, Johnson stated: "[Bedell] has little or no work history to my knowledge, and her depression has been a nearly life-long struggle, despite multiple anti-depressant medications and attempts at outpatient treatment."  (*Id.*)

Like Silveria's opinions, the ALJ gave Johnson's opinions "only limited weight" because (1) Johnson is not an "acceptable medical source" under the regulations; and (2) her opinions are "not fully supported by or consistent with the record."  (AR 31.)  The ALJ also stated that Bedell "was able to engage in [a] Department of Labor job search on her own"; and, contrary to Johnson's belief, Bedell "does have a demonstrated work history."  (*Id.*)

**D.    Treating Physician Dr. Linda Zamvil and Consulting Psychologist Dr. Martin Brutus**

In March 2009, Bedell treated with psychiatrist Dr. Linda Zamvil.  (AR 286.)  Dr. Zamvil noted that Bedell had been physically abused as a child, and that her children had been removed from her custody approximately one-and-one-half years earlier.  (*Id.*)  After examining Bedell, and observing that she exhibited a "blunted affect" and reported

11

poor sleep and thoughts of suicide, Dr. Zamvil diagnosed Bedell with severe recurrent major depression without psychotic behavior, rule out posttraumatic stress disorder, and rule out bipolar spectrum disorder.  (*Id.*)  Dr. Zamvil saw Bedell again approximately one week later, and noted that Bedell was feeling better, getting more sleep, and exhibited a "full affect."  (AR 288.)  Nonetheless, Bedell's diagnosis remained the same: severe recurrent major depression without psychotic behavior.  (*Id.*)  The ALJ did not discuss Dr. Zamvil's diagnosis or treatment notes.

A few months later, in June 2009, Bedell met with consulting psychologist Dr. Martin Brutus for a psychosocial assessment to determine eligibility for disability benefits.  (AR 369.)  Like Dr. Zamvil, Dr. Brutus diagnosed Bedell with severe recurrent major depression.  (AR 372.)  Moreover, in his four-plus-page assessment, Dr. Brutus found that a generalized anxiety disorder was indicated, and assigned Bedell a Global Assessment of Functioning ("GAF") score of 53 (*id.*), which places Bedell in the category of "51–60," indicating "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)," Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 32 (4th ed. 2000).  Dr. Brutus explained that Bedell had "[l]imitations in social and employment functioning," which were "likely due to cognitive, emotional, personality, [and] social skills deficits and physical pain secondary to neuropathy and [c]arpal [t]unnel syndrome."  (AR 373.)  Dr. Brutus concluded that Bedell was in the "engagement stage" of treatment for her mental health and other

symptoms, and vocational rehabilitation "could be helpful to enhance the possibility for an improved work, but also mental health prognosis." (*Id.*) Despite her depression and other mental problems, Dr. Brutus found that Bedell had "[n]o significant cognitive impairment or memory deficits." (AR 371.)

The ALJ gave Dr. Brutus's opinions regarding Bedell's social and employment functioning only "moderate weight," on the grounds that Dr. Brutus "did not provide an opinion regarding [Bedell's] specific functional limitations and abilities." (AR 31.) At the same time, however, the ALJ gave Dr. Brutus's opinions regarding Bedell's cognitive abilities "great weight" because they are "consistent with and supported by the evidence of record." (*Id.*)

### E.    Partial Psychiatric Hospitalization and Intensive Outpatient Treatment

In October 2009, Bedell was admitted to Fletcher Allen Health Care's partial psychiatric hospitalization program. (AR 481, 487.) The Admission Assessment states that Bedell was referred to the program "because her depression appears to interfere with her ability to care for her own health" (AR 481), and the Diagnostic Assessment states that Bedell's primary care provider "is very concerned that her management of her [diabetes] is in serious jeopardy because of the lack of interest and motivation for self[-]care" (AR 487). The Diagnostic Assessment continues: Bedell "sleeps much of the day and has fitful sleep at night." (*Id.*) She presented "with severe depression and appear[ed] to have a somewhat insufficient understanding of the risk of her depression and poor medical self-care continuing." (*Id.*) On the date of admission, Bedell was assessed as having a GAF score of 45, placing her in the category of "41–50," which indicates

"[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)."  *DSM-IV*, at 32.

By November 2009, Bedell's symptoms had improved, and she was discharged from the partial psychiatric hospitalization program and placed in an intensive outpatient psychiatric program called the Seneca Center.  (AR 586.)  Even though Bedell had improved during her partial psychiatric hospitalization, she was assessed with a GAF of only 48 at discharge (AR 586), a mere three points higher than when she was admitted and in the same GAF category of "41–50," indicating serious symptoms or serious impairment in social or occupational functioning.  After having problems with absenteeism, Bedell was discharged from the Seneca Center program in December 2009. (AR 586, 588.)  Social worker Sudhir Shantinath stated in the Discharge Summary that, although Bedell had been "attentive in the groups with a positive future orientation," it was not possible to make a "clear determination" of her condition at discharge because she had missed her last two days of treatment.  (AR 588.)

The ALJ summarized these treatment notes, and concluded that Bedell's condition had "stabilized" upon her discharge from Seneca Center.  (AR 31.)

### F.      Agency Consultants Drs. Ellen Atkins and Joseph Patalano

In August 2009, Dr. Ellen Atkins, a state agency psychologist, opined based on her review of the record that Bedell had mild limitation in activities of daily living and maintaining social functioning; moderate limitation in maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation of extended

duration.  (AR 412.)  Dr. Atkins further opined that Bedell was not significantly limited in either her ability to interact socially or her ability to adapt to changes in a work setting. (AR 417.)  Dr. Atkins concluded that, despite her impairments, Bedell retained the understanding and memory for one-to-three-step instructions; could maintain concentration, persistence, and pace for two-hour periods; had no restrictions in her social interactions; and retained the ability to handle changes, travel, set goals, and avoid hazards.  (AR 418–19.)  A few months later, in December 2009, Dr. Atkins completed a second assessment of Bedell's mental functional capacity, this time taking into account Bedell's partial psychiatric hospitalization at Fletcher Allen Health Care.  (AR 522–39.) Despite this new evidence, Dr. Atkins opined that Bedell retained the mental capacity to work at essentially the same level as stated in her August 2009 opinion.

The ALJ gave "great weight" to Dr. Atkins's opinions on the grounds that they are "supported by and consistent with the evidence of record."  (AR 31.)  The ALJ also gave "great weight" to the June 2010 opinions of state agency psychologist Dr. Joseph Patalano, who, after reviewing the record, made virtually the same opinions as Dr. Atkins.  (AR 31, 663–80.)

## II.    Evaluation of ALJ Analysis of the Opinion Evidence

The record clearly reflects an individual who has been unable to function in several key areas of living, including managing her own serious medical condition (diabetes) and caring for her two young children.  The ALJ and the consulting physicians acknowledge these deficiencies, but fail to adequately consider the opinions of Bedell's treating nurse, service coordinator, and social worker regarding the severity of Bedell's

depression.  As summarized above, NP Malone-Rising, service coordinator Silveria, and

social worker Johnson each had a treating or professional relationship with Bedell and

observed her ability to function on a day-to-day basis.  Each independently opined that

Bedell's depression was paralyzing and affected every aspect of her life.  The agency

consultants, on the other hand—who never met with Bedell and whose opinions are the

only ones to which the ALJ afforded great weight in their entirety—opined that Bedell

was not significantly limited in her ability to function.  Generally, where, as here, there

are conflicting opinions between treating and consulting sources, the "consulting

physician's opinions or report should be given limited weight."  *Cruz v. Sullivan*, 912

F.2d 8, 13 (2d Cir. 1990).  This is particularly true where, as here, the consultants did not

examine the claimant and made their opinions without considering the relevant treating

source opinions.  *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general

rule is that . . . reports of medical advisors who have not personally examined the

claimant deserve little weight in the overall evaluation of disability.") (internal quotation

marks omitted); *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is unclear

whether agency consultant reviewed all of claimant's relevant medical information,

consultant's opinion is not supported by evidence of record as require to override treating

physician opinion).

      The ALJ found that Silveria's and Johnson's opinions were worth only limited

weight, in part because Bedell "was able to engage in [a] Department of Labor job search

on her own."  (AR 31.)  This finding is based on Silveria's October 2008 notation that

"[Bedell] enrolled in Voc Rehab. and doing DOL job search, referred to Voc Rehab to

assist w/electric, because [she and her husband] are unable to make paym't agreement."
(AR 648.)  Nothing about this vague and confusing notation indicates that Bedell was
"engaging" in a job search on her own, and there do not appear to be other records
indicating that such a job search was occurring around this period (i.e., there are no
records of Bedell attending interviews or submitting applications for jobs).  The ALJ also
defended her decision to give little weight to Johnson's opinions on the grounds that
Johnson erroneously stated in her April 2010 letter that Bedell "'has little or no work
history to my knowledge.'"  (AR 31 (quoting AR 662).)  Although the ALJ is correct that
this statement is factually wrong, given that Bedell held housekeeping and cashier jobs
from approximately June 1990 through August 2008, the error is mitigated by the fact
that Bedell had not worked for almost two years prior to the statement being made,
starting in August 2008, when the alleged disability period began.  (AR 219.)  In any
event, although Bedell's work history and ability to conduct a job search are appropriate
factors for the ALJ to consider in assessing Silveria's and Johnson's opinions, they are
not particularly meaningful in light of other more significant factors, including the
consistency of these opinions with the record as a whole, as discussed below.

   The ALJ also noted that Silveria's comments about Bedell's poor hygiene are "not
reflected elsewhere in the record" (AR 30), but this is not an accurate statement.  As
quoted above, Johnson stated in her April 2010 letter that Bedell "struggles with self-care
and tends to present with unkempt hair, unwashed/wrinkled clothing[,] and a slight, but
noticeable body odor."  (AR 662.)  And NP Malone-Rising's comment in her July 2011

17

letter that Bedell's depression "affects every aspect of her life" (AR 705) could plausibly imply that Bedell had difficulty maintaining hygiene.

Another rationale provided by the ALJ for her allocation of limited weight to the opinions of Silveria and Johnson was that these opinions "are not fully supported by or consistent with the record." (AR 31.)  But they are consistent with each other, and also with the opinions of NP Malone-Rising.  They are also somewhat consistent with the treatment notes of Dr. Zamvil and the consultation report of Dr. Brutus, both of whom diagnosed Bedell with severe recurrent major depression.  (AR 286–88, 369–73.)  The only relevant records that are *in*consistent with the opinions of Silveria and Johnson are the opinions of the non-examining agency consultants.

Regarding NP Malone-Rising's opinions, the ALJ gave less than great weight to her opinions about the severity and limiting effects of Bedell's depression because those opinions "did not [include] a detailed functional assessment." (AR 32.)  Yet NP Malone-Rising's opinions about Bedell's diabetes also did not include a detailed functional assessment, and the ALJ afforded "great weight" to them.  (AR 29.)  The ALJ also noted that NP Malone-Rising "deferred to the evaluation of psychologists or physicians trained in disability evaluations." (AR 31 (citing AR 367).)  But in fact, NP Malone-Rising's more recent opinion does not suggest any deferral to another source.

Finally, the ALJ defended her allocation of limited weight to the opinions of Johnson and Silveria on the grounds that neither was an "acceptable medical source" under the regulations.  (AR 31.)  The ALJ's notation that NP Malone-Rising deferred to the evaluations of "psychologists or physicians trained in disability evaluations" appears

to make a similar finding regarding her opinions.  (*Id.* (citing AR 367).)  It is true that NP Malone-Rising, Silveria, and Johnson, are not "acceptable medical sources," but that is not reason enough to discount their opinions, especially when there are no treating physician opinions regarding Bedell's depression.  Although Dr. Brutus gave an opinion, he met with Bedell in consultation on only one occasion, and thus is not considered a "treating physician" under the regulations.  *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) (defining a "treating physician" as a physician "who has or had an ongoing treatment and physician-patient relationship with the individual").  And Dr. Zamvil did not give an opinion on Bedell's depression or limitations, and in any event appears to have met with Bedell only two times, which again is not sufficient to make her a "treating physician" under the regulations.[2]  *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (treating sources who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983)).

As a nurse practitioner, a service coordinator, and a social worker, NP Malone-Rising, Silveria, and Johnson were not "acceptable medical sources," and thus the treating physician rule does not apply to their opinions.  20 C.F.R. §§ 404.1513(a), (d), 404.1527(c)(2).  Generally, the opinions of nurse practitioners and social workers are not entitled to the same weight as those of a treating physician.  *See, e.g.*, *Mongeur*, 722 F.2d at 1039 n.2 (noting that while the diagnosis of a nurse practitioner is entitled to some consideration, it "should not be given the extra weight accorded a treating physician");

---

[2]  As noted earlier, the ALJ did not discuss Dr. Zamvil's treatment notes in her decision.

*Marziliano v. Sullivan*, 771 F. Supp. 69, 75 (S.D.N.Y. 1991) (noting that the opinion of claimant's social worker did not command the same weight as treating physician's opinion).   Nonetheless, the ALJ was required to provide a reasonable explanation for her decision to afford limited weight to these opinions.   *See, e.g.*, *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010).   Social Security Ruling (SSR) 06-03p states that, in addition to evidence from "acceptable medical sources," ALJs may use evidence from "other sources" to show the severity of the claimant's impairments and how they affect the claimant's ability to function.   SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).[3]   These "other sources" include medical sources who are not "acceptable medical sources," such as nurse practitioners and licensed clinical social workers, and "non-medical sources" such as public and private social welfare agency personnel.   *Id.*

SSR 06-03p explains that medical sources like nurse practitioners and licensed clinical social workers, who are not technically deemed "acceptable medical sources" under the regulations, "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* at *3.   Thus, opinions from these medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."   *Id.*   The Ruling further explains that "non-medical sources," such as social welfare agency personnel who are not health care providers and have had contact with the claimant in their professional capacity, are also valuable

---

[3]   Although they are not given the force and effect of law, SSRs are entitled to deference, unless they are clearly erroneous or inconsistent with the Social Security Act.   *See Walker v. Sec'y of Health and Human Servs.*, 943 F.2d 1257, 1259–60 (10th Cir. 1991).

sources of evidence for assessing impairment severity and functioning.  *Id.*  "Often, these sources have close contact with the [claimant] and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  *Id.*

SSR 06-03p directs ALJs to apply the following factors in evaluating opinion evidence from "other sources" (medical and non-medical): (1) how long has the source known and how frequently has she seen the claimant; (2) how consistent is the source's opinion with other evidence; (3) does the source present relevant evidence to support her opinion; (4) how well does the source explain her opinion; (5) is the source a specialist or expert in the area related to the claimant's impairment; and (6) any other factors tending to support or refute the opinion.  *Id.* at *4–5.  The Ruling allows for both "other medical source" and "other non-medical source" opinions to outweigh the opinions of "acceptable medical sources":

> [D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source.  For example, *it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.*
>
> . . .
>
> An opinion from a 'non-medical source' who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source.  For example, *this could occur if the 'non-medical source' has seen the individual more often and has greater knowledge of the*

> *individual's functioning over time and if the 'non-medical source's'*
> *opinion has better supporting evidence and is more consistent with the*
> *evidence as a whole.*

*Id.* at *5, 6 (emphases added).

In this case, the ALJ failed to consider that NP Malone-Rising, service coordinator Silveria, and social worker Johnson are the only professionals who had ongoing relationships with Bedell to treat or otherwise assist her in handling her diabetes and depression and to function in general (e.g., maintain housing, pay bills, and attend visitation with her children). All three of these professionals unequivocally opined that Bedell's depression was paralyzing and affected every aspect of her life. In distinct contrast, agency consultants Drs. Atkins and Patalano opined that Bedell was not significantly limited in her ability to interact socially and make plans independently, among other things. (AR 537, 664.) Not only had these consultants not met with or examined Bedell, but also, given that Dr. Atkins's assessments are dated August and December 2009 and Silveria's and Johnson's letters are dated February and April 2010, respectively, Dr. Atkins did not have the benefit of considering the significant opinions of Silveria and Johnson before making her opinions. Moreover, Dr. Atkins could not have considered NP Malone-Rising's July 2011 letter because it was written over a year after Dr. Atkins prepared her most recent assessment. Although Dr. Patalano prepared his assessment after Silveria's and Johnson's letters were drafted, he failed to mention those letters in his assessment. And Dr. Patalano could not have considered NP Malone-Rising's July 2011 letter in his assessment because that letter was written over a year after his assessment was prepared. It is plausible that the opinions of Drs. Atkins and

Patalano would have been different had they considered the significant opinions of NP Malone-Rising, Silveria, and Johnson that post-dated their assessments.  For example, it is likely the consultants would have found Bedell to be at least moderately limited in her ability to interact socially and adapt to changes had they reviewed and considered these other opinions.  (*See* AR 537, 664.)

Also noteworthy, in her more recent assessment, Dr. Atkins stated that, although Bedell had a "recent exacerbation in depression" beginning in October 2009 (when she was admitted to Fletcher Allen Health Care for psychiatric treatment), that exacerbation was "resolving with intensive treatment and RX changes, and can reasonably be expected to continue to improve to baseline functioning as treatment intensity is reduced."  (AR 538.)  After Dr. Atkins wrote this assessment, however, Bedell's symptoms did not resolve.  In April 2010, approximately six months after Bedell attended the intensive psychiatric treatment, social worker Johnson stated as follows: "While I observed some improvement in [Bedell's] condition during and immediately following treatment, she has since relapsed into the same symptom pattern that I observed prior to treatment." (AR 662.)

Clearly, Bedell has not effectively handled the basic requirements of everyday living—she repeatedly failed to comply with prescribed treatment including managing her diabetes; she neglected her children resulting in the state removing them from her custody; she failed to consistently attend supervised visits with her children; she terminated treatment of her depression with a therapist; she lost her job; and she depended on her disabled husband to do most of the daily household chores including

cooking and cleaning.  Those professionals who had a relationship with Bedell opined that her inability to function was related to her depression.  The ALJ did not adequately assess these opinions, and thus I recommend remanding for a reassessment of the medical and non-medical opinions, including particularly the opinions of NP Malone-Rising, service coordinator Silveria, and social worker Johnson.  The ALJ may be required to request updated assessments from the agency consultants on remand, in light of the more recent opinions of NP Malone-Rising, service coordinator Silveria, and social worker Johnson.

## Conclusion

For these reasons, I recommend that Bedell's motion (Doc. 25) be GRANTED; the Commissioner's motion (Doc. 29) be DENIED; and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 12th day of December, 2013.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).